\(V

RECEIVED

DEC 23 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court

Northern District of Illinois

Samantha Parreno,

Plaintiff,

1:24-cv-13180
Judge Alexakis
Magistrate Judge Gilbert
RANDOM CAT 2

v.

David Sutherland Inc., Perennials and Sutherland, LLC, David Sutherland, LLC,

Bertram Capital, and Jennifer Hirz (in her individual capacity under state law only),

Defendants.

COMPLAINT

INTRODUCTION

1. Plaintiff Samantha Parreno brings this action to address unlawful employment practices, defamation, retaliation, and procedural misconduct under federal and state laws.

2. Defendants' actions violated:

- Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), as amended by the Pregnancy Discrimination Act (PDA);

- The Family and Medical Leave Act (FMLA, 29 U.S.C. § 2601 et seq.);
- Illinois Human Rights Act (IHRA, 775 ILCS 5/1-101 et seq.);
- Illinois Whistleblower Act (IWA, 740 ILCS 174/1 et seq.);
- Illinois Wage Payment and Collection Act (IWPCA, 820 ILCS 115/1 et seq.); and
- Common law principles of defamation and breach of implied contract.

3. Plaintiff also seeks damages arising from the professional negligence and procedural misconduct of her former attorney, which prejudiced her ability to pursue justice during critical administrative proceedings.

JURISDICTION AND VENUE

4. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and supplemental jurisdiction over state claims under 28 U.S.C. § 1367.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district.

PARTIES

6. Plaintiff Samantha Parreno is a former employee of Defendants who resides in Chicago, Illinois.

7. Defendant David Sutherland Inc., Defendant Perennials and Sutherland LLC, and Defendant David Sutherland LLC operate as integrated employers under the

integrated enterprise doctrine, supported by Papa v. Katy Industries, Inc., 166 F.3d 937 (7th Cir. 1999).

8. Defendant Bertram Capital is an investment partner of Perennials and Sutherland LLC and is directly involved in its management and governance, making it liable under principles of piercing the corporate veil, as established in Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565 (7th Cir. 1985).

9. Defendant Jennifer Hirz, the former Director of Human Resources and current Vice President of Human Resources for Perennials and Sutherland LLC, is being sued under Illinois state law for her direct involvement in discriminatory, retaliatory, and unlawful actions.

FACTUAL BACKGROUND

EEOC Charge and Notice of Right to Sue

10. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), on February 12, 2024. (*See* EEOC Charge, **Exhibit A**)

11. Plaintiff was issued a "Notice of Right to Sue" by the EEOC on September 25, 2024, granting Plaintiff a legal right to file a lawsuit in federal or state court regarding their employment discrimination claim. (*See* Notice of Right to Sue, **Exhibit B**)

Employment History and Pregnancy Disclosure

12. Plaintiff worked for Defendants from May 13, 2019, to October 13, 2024, consistently meeting or exceeding performance expectations, as supported by their documented performance reviews. (*See* 2023 Annual Review, **Exhibit C**)

13. First instance of Pregnancy Discrimination (2021). Although the following account of Plaintiff's first pregnancy in 2021 is not a direct part of this lawsuit, it serves as important background to highlight a pattern of pregnancy discrimination and to contextualize the events surrounding Plaintiff's second pregnancy in 2023. During their third trimester, Plaintiff faced excessive work hours and was compelled to take on the responsibilities of multiple positions following the resignation of the entire Inside Sales team at the Chicago Showroom. Consequently, Plaintiff became solely responsible for maintaining operations there. Despite informing Defendants, including Defendant Hirz, that the workload was unmanageable, Plaintiff's appeals for support—particularly in light of her pregnancy-related concerns—were disregarded. Defendants failed to provide timely assistance, leaving Plaintiff to work long hours without breaks over an extended period.

14. On or about June 29, 2023, in good faith Plaintiff disclosed their pregnancy to Defendants and requested support to manage their workload.

15. On or about July 11, 2023, Defendants issued Plaintiff a Corrective Action based on pretextual allegations that were not disclosed during the disciplinary meeting.

16. Defendants misrepresented the Plaintiff's account inactivity in the Position Statement by falsely claiming that there was no activity for several days. This inaccurate time frame was also reflected in the Corrective Action, rendering these allegations pretextual in light of the Plaintiff's disclosure of their pregnancy. Specifically, the period

in question spans from July 1, 2023, to July 4, 2023. It is important to highlight that July 1-2, 2023, fell on a weekend when Defendants, Perennials and Sutherland, LLC, were closed. Additionally, on July 3, 2023, Plaintiff had received approved time off, as confirmed by ADP documentation (the platform utilized by Defendants for managing Human Resources functions, including time and attendance tracking). Lastly, Defendants were closed on July 4, 2023, in observance of the holiday. Plaintiff will seek records of all disciplinary actions taken against non-pregnant similarly situated employees for account inactivity during this timeframe from all Defendants. (*See* Position Statement, **Exhibit D**)

17. On or about July 12, 2023, Plaintiff contested the Corrective Action, explicitly citing retaliation, and referenced their concerns of unfair treatment, but received no substantive response from Defendants.

FMLA Leave Process and Interference

18. On or about August 14, 2023, Plaintiff experienced a miscarriage, requiring medical leave.

19. On or about August 15, 2023, Defendant Hirz provided Plaintiff with a Leave of Absence Letter, indicating that, based on their length of service, Plaintiff was eligible for medical leave. The letter also included the necessary documentation for the Plaintiff to file an FMLA claim with AbsencePro, the Defendants' third-party administrator (TPA). (*See* Leave of Absence Letter and FMLA Flyer, **Exhibit E**)

20. Plaintiff's doctor submitted the necessary medical documentation, and AbsencePro the Defendants (TPA) approved Plaintiff for FMLA leave beginning August 16, 2023. (*See* AbsencePro documentation, **Exhibit F**). (*See* Mutual of Omaha documentation, **Exhibit G**)

21. Despite having received approval, the Defendants retroactively reclassified Plaintiff's leave as "Non-FMLA Medical Leave" while Plaintiff was on leave, doing so without notice, consent, or explanation. This action violates 29 C.F.R. §§ 825.300–301. Plaintiff seeks records of all communications between Defendants, Defendant Hirz, Defendants' counsel, AbsencePro (Defendants third-party administrator), and Mutual of Omaha (the parent company of AbsencePro), from August 15, 2023, to the present date.

22. During Plaintiff's leave, Defendants manipulated Plaintiff's PTO records and altered commission eligibility. According to the Defendants' Outside Sales Representative Commission and Incentive Plan, employees on a leave of absence are eligible for monthly commission only if they are actively employed on the 15th day of the month. Plaintiff was considered an active employee on that day, as they had utilized a PTO day. However, Plaintiff never received their commission for August 2023, resulting in financial harm. Relevant supporting documents include (*See* Outside Sales Representative Commission and Incentive Plan, **Exhibit H**), (*See* Defendant Hirz's PTO email confirmation, **Exhibit I**), (*See* Documentation from ADP, the platform utilized by Defendants Perennials and Sutherland, LLC for managing Human Resources functions, including time and attendance tracking, **Exhibit J**).

23. On or about October 10, 2023, approximately one month after Plaintiff's leave claim was closed and three weeks after Plaintiff returned to work, Defendants further retroactively changed the leave start date to August 15, 2023. This alteration contradicts certified medical documentation and Plaintiff's request for transparency, thereby violating 29 C.F.R. §§ 825.300–301.

24. Plaintiff seeks records of all communications between Defendants, Defendant Hirz, Defendants' counsel, AbsencePro (Defendants third-party administrator), and Mutual of Omaha (the parent company of AbsencePro), from August 15, 2023, to the present date.

25. On or about November 13, 2023, following their termination, Plaintiff received a corrected letter from AbsencePro (the Defendants' third-party administrator) confirming the original approved leave date of August 16, 2023. AbsencePro informed the Plaintiff that they had attempted to contact the Defendants' Human Resources Department multiple times for clarification regarding the date change. Defendants' Human Resources Department did not provide sufficient documentation to support their request for retroactively changing Plaintiff's leave date to August 15, 2023, nor did they respond to AbsencePro's request for additional documentation.

26. Despite Plaintiff's efforts to seek clarification regarding the unjustified retroactive change to their leave start date, AbsencePro failed to mention the retroactive reclassification of the Plaintiff's leave designation during these discussions. Rather than correcting the original approved FMLA leave, AbsencePro maintained the classification as Non-FMLA Medical Leave. Plaintiff was unaware of the distinction between FMLA

leave and Non-FMLA Medical Leave, as Defendant Hirz had provided Plaintiff with information to file an FMLA claim with AbsencePro and the Plaintiff had been issued an approved FMLA Leave document from AbsencePro.

At no point did Plaintiff receive information from the Defendants, Defendant Hirz or AbsencePro about the reasons for this change or the differences in leave designations. Plaintiff only became aware of the implications of this classification upon receiving the Defendants' position statement and had not requested a correction to the original approved FMLA leave due to a lack of understanding of its consequences. This is a direct violation of 29 C.F.R. § 825.300(d). This was done in bad faith as a pretext for the plaintiffs termination so she would no longer be afforded FMLA protections. Defendant Hirz, and AbsencePro's failure to adequately inform Plaintiff of their rights under the FMLA. In direct violation of 29 C.F.R. § 825.300–301, 29 U.S.C. § 2615(a)(1)

Retaliation, Hostile Work Environment, and Termination

27. Upon Plaintiff's return from leave on or about September 20, 2023, Defendants subjected her to heightened scrutiny, public reprimands, and increased performance expectations not imposed on similarly situated employees.

28. On or about October 13, 2023, Plaintiff was terminated for pretextual reasons. This claim is supported by the IDES determination issued on November 7, 2023, which concluded that the termination was not based on misconduct. Furthermore, just three days prior to the termination, on October 10, 2023, Plaintiff received documentation from AbsencePro (TPA), indicating a retroactive change to Plaintiff's leave start date, which was revised from August 16, 2023, to August 15, 2023. Relevant documentation

is provided in (*See* IDES Determination, **Exhibit K**), (*See* AbsencePro Documentation, **Exhibit L**), (*See* Mutual of Omaha Documentation, **Exhibit M**)

Defamation and Procedural Deficiencies

29. In its position statement to the EEOC, Defendants knowingly made false and defamatory claims, including but not limited to:

- Claiming Plaintiff was ineligible for FMLA leave, despite the approval granted by AbsencePro, Defendants' third-party administrator (TPA).

- Claiming that Plaintiff was well aware that their approved leave was non-FMLA medical leave.

- Claiming Defendants started Plaintiff's non-FMLA medical leave beginning on August 15, 2023, a date that was also approved by AbsencePro, the Defendants' (TPA).

- Claiming Defendants never changed the Plaintiffs leave date.

- Claiming Plaintiff later submitted amended paperwork indicating their leave began on August 16, prompting AbsencePro, the Defendants' (TPA), to revise the start date of their leave. Defendants assert that Plaintiff realized they would not be eligible for commissions if their leave started on August 15, leading Plaintiff to submit amended paperwork to qualify for commissions.

- Claiming that Plaintiff never raised concerns about retaliation, despite documented evidence in which Plaintiff explicitly cited retaliation to the Defendants and Defendant Hirz from on or about July 12, 2023, to on or about October 13, 2023.

- Claiming Plaintiff did not take a PTO day on August 15, 2023.

- Claiming Plaintiff did not request PTO or have any time off approved during the period from July 1, 2023, to July 4, 2023, asserting that Plaintiff's account confirmed inactivity for several days. However, this time frame includes a weekend, documentation from ADP of approved time off, and the observance of the Fourth of July holiday.

- Claiming Plaintiff was terminated for consistently failing to meet performance and behavioral expectations. However, the IDES determination, based on the evidence gathered, indicates that Plaintiff was discharged solely due to a lack of activity on Salesforce for three hours, which did not constitute a violation of any reasonable rule or policy of the employing unit.

30. These statements were made in bad faith and caused significant harm to Plaintiff's professional reputation.

Attorney Misconduct

31. Plaintiff's former attorney engaged in the following misconduct:

- Prematurely disclosed Plaintiff's EEOC charge to opposing counsel without Plaintiff's consent on February 13, 2024, the day after the Discrimination Charge was filed with the EEOC.

- Failed to submit crucial evidence to the EEOC during their investigation, including AbsencePro documentation, PTO misrepresentations, and emails stating retaliation. This left the Defendants' misrepresentations, falsehoods, and inaccuracies in their

Position Statement to the EEOC on April 19, 2024, unchallenged. This omission allowed the Defendants claims to go unrefuted.

- The Notice of Right to Sue was not requested on July 22, 2024. The Plaintiff's former attorney had previously advised the Plaintiff to seek this notice during their representation. However, despite the Plaintiff's clear instructions to request the Notice of Right to Sue from the EEOC, the attorney failed to do so. Instead, they communicated to the EEOC that settlement negotiations would not be pursued, without informing the Plaintiff of these developments.

- Under the impression that their attorney had made the request, the Plaintiff followed up on August 28, 2024, to check the status. On August 29, 2024, the former attorney informed the Plaintiff that they had not requested the Notice on the Plaintiff's behalf, reiterated that they had notified the EEOC about the decision not to engage in settlement negotiations, and stated that they were no longer willing to proceed with litigation. The attorney advised the Plaintiff to seek new representation that would better align with their goals.

- On September 10, 2024, Plaintiffs former attorney advised Plaintiff that the EEOC is now ready to close its investigation, as the investigator has not found enough evidence to issue a "for cause" in Plaintiffs favor. Furthermore, they informed the Plaintiff that the EEOC is giving them the opportunity to request the Notice as a courtesy. Informing the Plaintiff that they need to make a decision on requesting the Notice by September 19, 2024.

- Plaintiff contacted the EEOC investigator for confirmation. The Investigator informed Plaintiff the attorney requested an extension for the Notice on September 3, 2024. The Investigator also informed Plaintiff that they provided the attorney with the extension date of September 18, 2024, if Plaintiff did not request the Notice by September 18, 2024, the case would be dismissed.

- Failed to appropriately disclose their working relationship with opposing counsel, as required by Rule 1.7 of the Illinois Rules of Professional Conduct.

32. This misconduct prejudiced Plaintiff's ability to obtain a fair EEOC investigation and forced her to proceed pro se during critical stages of her case.

Misuse of Rule 408

33. On or about October 25, 2024, Defendants' counsel improperly invoked Rule 408 of the Federal Rules of Evidence to exclude critical evidence proving their misrepresentation in the EEOC position statement.

- This evidence, which included an email from Defendant Hirz to Plaintiff confirming that Plaintiff entered eight hours of PTO on August 15, 2023, and the documentation from ADP confirming Plaintiffs PTO day August 15, 2024. Demonstrated the falsity of Defendants' claims regarding Plaintiff's alleged misconduct and the reclassification of their FMLA leave.

- The misuse of Rule 408 exemplifies Defendants' pattern of bad faith litigation tactics, designed to prejudice Plaintiff and obscure the truth.

Attorney Misconduct and Procedural Failures

- Defendants' counsel, with knowledge of their client's falsehoods, coordinated procedural maneuvers such as the misuse of Rule 408 to undermine the fairness of proceedings.

- This misconduct compounded the procedural failures initiated by Plaintiff's former attorney, who failed to submit critical evidence during the EEOC investigation, thereby prejudicing Plaintiff's case.

CLAIMS FOR RELIEF

Count I: Violation of Title VII of the Civil Rights Act

Against Corporate Defendants Only

- Discrimination and retaliation based on pregnancy and medical conditions, actionable under 42 U.S.C. § 2000e(k) and supported by Young v. United Parcel Service, Inc., 575 U.S. 206 (2015). The Supreme Court held that the Pregnancy Discrimination Act requires employers to treat pregnant employees the same as other employees who are similar in their ability or inability to work.

Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court ruled on the scope of anti-retaliation protections under Title VII of the Civil Rights Act of 1964. The Court held that the anti-retaliation provision of Title VII is not limited to actions that affect the terms and conditions of employment, but also

covers actions that might dissuade a reasonable worker from making or supporting a charge of discrimination.

Count II: Violation of the Family and Medical Leave Act (FMLA)

Against Corporate Defendants Only

- Interference and retaliation under 29 U.S.C. § 2615 and 29 C.F.R. §§ 825.300–301, as established in Graziadio v. Culinary Institute of America, 15-888-cv (2016), the Second Circuit's decision serves as a significant precedent in interpreting the responsibilities and liabilities of both employers and individual supervisors under the FMLA. This case underscores the importance of clear and cooperative communication between employers and employees regarding FMLA leave. Additionally, the decision highlights that individuals, such as human resources directors, can be held personally liable under the FMLA if they exercise sufficient control over an employee's employment.

Bryant v. Dollar General Corporation, 07-5006 (2008), the Sixth Circuit's decision serves as a critical reminder of the legal obligations employers have under the FMLA and the potential consequences of non-compliance.

Count III: Violation of the Illinois Human Rights Act (IHRA)

Against All Defendants, Including Hirz

- Disparate treatment and retaliation based on pregnancy, supported by Rongere v. City of Rockford, 2022 IL App (2d) 210108.

Count IV: Violation of the Illinois Whistleblower Act (IWA)

Against Corporate Defendants Only

- Retaliation for reporting PTO manipulation and FMLA reclassification under 740 ILCS 174/15(b).

Count V: Defamation (Common Law)

Against Corporate Defendants Only

- False statements to the EEOC caused reputational harm, supported by Bryson v. News America Publications, Inc., 174 Ill. 2d 77 (1996).

Count VI: Breach of Implied Contract

Against Corporate Defendants Only

- Failure to honor policies regarding commissions and PTO, supported by Duldulao v. Saint Mary of Nazareth Hospital Center, 115 Ill. 2d 482 (1987).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Compensatory Damages:

- Award back pay for lost wages, commissions, and benefits resulting from Plaintiff's termination and Defendant's unlawful actions.
- Award front pay to compensate for future lost earnings resulting from the damage to Plaintiff's career caused by Defendant.

2. Punitive Damages:

   - Award punitive damages to punish Defendant for intentional, malicious, and reckless disregard for Plaintiff's rights under federal and state laws, including Pregnancy Discrimination Act (PDA). FMLA, and the Illinois Human Rights Act (IHRA).

3. Emotional Distress Damages:

   - Award damages for the emotional pain, suffering, humiliation, and distress Plaintiff has endured as a result of Defendants unlawful conduct.

4. Liquidated Damages:

   - Award liquidated damages under the FMLA, which permits such damages for wilful violations of its provisions.

5. Injunctive and Declaratory Relief:

   - Issue an injunction requiring Defendant to implement policies, procedures, and training to prevent future discrimination, retaliation, and FMLA violations.

   - Declare that Defendant's actions violated Plaintiff's rights under the Pregnancy Discrimination Act (PDA), FMLA, Title VII, and the IHRA.

6. Equitable Relief:

   - Provide equitable relief in the form of front pay and benefits.

7. Attorneys' Fees and Costs:

   - In anticipation of hiring counsel for litigation.

8. Prejudgement and Postjudgment Interest:

- Award prejudgment and postjudgment interest on all amounts awarded to Plaintiff to fully compensate for their loss of use of funds caused by Defendant's unlawful conduct.

9. Other Relief:

Grant any additional relief that the Court deems just, equitable, and proper under the circumstances.

10. Liquidated damages under the FMLA

11. Costs and attorneys' fees in anticipation that Plaintiff retains counsel for litigation.

12. Any other relief the Court deems just and equitable.

JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

Samantha Parreno

12.23.2024

EEOC RECEIVED: 02-13-2024

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

[ ] FEPA
[X] EEOC 440-2024-04299

Illinois Department Of Human Rights and EEOC
*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Samantha Parreno | 312-925-7762 | N/A |

| Street Address | City, State and ZIP Code |
|---|---|
| 2247 W Medill Ave. Apt. 3F | Chicago, IL 60647 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| Perennials and Sutherland, LLC | 500+ | 312-205-7700 |

| Street Address | City, State and ZIP Code |
|---|---|
| 222 West Merchandise Mart Plaza, Suite 1400 | Chicago, IL 60654 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [ ] DISABILITY [X] OTHER *(Specify below.)*
Pregnancy

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: Latest: 10/13/2023
[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Please see attached for Particulars

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

1.9.2024 [signature]
Date Charging Party Signature

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

A

**EXHIBIT A**

I joined Perennials & Sutherland, LLC ("Respondent") in or around May of 2019 as an Inside Sales Representative, working out of the Chicago showroom. Throughout my time with the company, I distinguished myself as a member of the team. I developed and maintained strong relationships with the top clients in the showroom; I developed comprehensive training manuals and innovative sales tools to onboard and train new hires; and I conducted regular and comprehensive product training sessions for inside and outside sales teams, including management personnel. I was consistently the top salesperson in the region throughout my more than four years with the company. As a result, in or around August of 2022 I was promoted to Outside Sales Representative, where I continued to perform at or above the level of my peers.

Despite that, I experienced significant pregnancy discrimination during my time with Respondent and was ultimately terminated in retaliation for speaking up about my treatment. Please consider the following:

In or around the summer of 2021, when I was pregnant with my first child, Respondent's entire showroom team resigned, leaving me as the sole member of the sales team in Chicago. As a result, I was forced to work far more than 40-hour work weeks, and I was unable to take lunch or other breaks throughout the day. In fact, my supervisor at the time issued me a company laptop during that time so that I could continue to work in the evenings and on the weekends in addition to my lengthy hours during the day.

Because I was in my third trimester at the time and, as a result, physically uncomfortable and tired, I contacted Respondent's Sales Director at the time, Lauren Carr, and Respondent's Director of Human Resources, Jennifer Hirz, to ask for help. I informed them that I was being asked to do the work of five team members and that, as a result of my pregnancy, I could not keep up. Despite that request, Respondent provided me with no support. Both Ms. Carr and Ms. Hirz assured me that they would hire additional staff and get me the help I needed, but they failed to make good on those promises in a reasonable timeframe. Instead, I continued to cover the work of the entire Chicago sales team until early September 2021, when I delivered my baby.

In or around June of 2023, I learned that I was pregnant again. By this time, I was one of three Outside Sales Reps and three Inside Sales Reps working out of the Chicago showroom and reporting to Showroom Manager Angela Lugo. Despite that, I was still carrying a disproportionately heavy workload.

On June 29, 2023, I disclosed my pregnancy to Ms. Lugo and asked for help. I explained that I felt unsupported by the showroom team, that I was so overloaded with responsibilities that I was unable to take lunch or breaks during my days in the showroom, and that I was concerned that the situation was taking a toll on my pregnancy. I asked for support. Ms. Lugo listened and took notes during this conversation. However, instead of providing me with support, Ms. Lugo issued me discipline.

Specifically, on July 11, 2023, less than two weeks after I disclosed my pregnancy, Ms. Lugo and Sales Director Emily Pool met with me and informed me that they were issuing me

**EXHIBIT A**

Corrective Action relating to deficiencies in my performance, including delays in updating my notes in SalesForce and other similar administrative issues. I had never been written up before and had only ever received glowing reviews, so I was surprised by this warning. But I was open to the feedback, thanked Ms. Lugo and Ms. Pool for bringing the issues to my attention, and agreed to work on improving in the areas they raised.

As I left the meeting, Ms. Lugo handed me a copy of the written Corrective Action form which they had been discussing. To my surprise, when I reviewed the document I found that in addition to the minor performance issues discussed at the meeting, Ms. Lugo had also written me up for behavioral issues – including allegedly providing little support to the team, believing that I was "entitled" to do less work than the rest of the team, and for accusing the inside sales team of being "inefficient" and "unreliable." None of these accusations had been addressed during my in-person disciplinary meeting with Ms. Lugo and Ms. Pool and none of them were true.

On July 12, 2023, I sent Ms. Lugo and Ms. Pool an email contesting the written warning. I noted that the behavioral allegations had not been discussed during the performance meeting, asked for specific examples of my alleged improper behavior, rebutted the facts that were included in the writeup, and noted that I believed that the writeup was retaliatory.

Ms. Pool responded that she was traveling but that she would review my concerns and get back to me once she was back in her office in New York. However, she never responded further. Ms. Lugo also responded briefly, but she failed to provide the examples I requested, failed to explain why the behavioral concerns had not been discussed at the in-person meeting, failed to respond to my rebuttal, and failed to address the allegation of retaliation. Instead, Ms. Lugo's email simply thanked me for my commitment to improving and said that they would continue to have one-on-one meetings to discuss my performance.

Sadly, in mid-August 2023, I suffered a miscarriage. I notified Respondent and took FMLA-protected leave from August 16, 2023 through September 19, 2023. During that period of leave, I was diagnosed with clinical depression and was prescribed antidepressants. My medical providers believe that both the miscarriage and my mental health issues were caused, in part, by Respondent's actions in dismissing my requests for help and instead issuing me discriminatory discipline.

On September 22, 2023, shortly after returning from FMLA-leave, I met with Ms. Hirz to discuss my concerns. By that time, nearly two and a half months had passed since I had submitted my rebuttal alleging retaliation, but neither Ms. Lugo nor Ms. Pool had responded. Thus, I felt I had no choice but to escalate my concerns to HR. I told Ms. Hirz that I had asked for help from Ms. Lugo because I was pregnant and felt unsupported by the showroom team but that rather than help, Ms. Lugo had issued me a Corrective Action.

It quickly became clear that Ms. Hirz was unaware of my rebuttal email altogether. She could not remember having been sent a copy by Ms. Pool or Ms. Lugo and the most recent

**EXHIBIT A**

document in my personnel file was the Corrective Action itself, not my rebuttal. I forwarded Ms. Hirz a copy of the rebuttal and she assured me that she would speak with Ms. Lugo and Ms. Pool and that they would respond to my concerns.

Sadly, from that point forward, I was subjected to a series of ongoing retaliatory acts culminating in my termination.

First, on or around September 27, 2023, Ms. Pool loudly reprimanded me in front of the entire Chicago showroom. Specifically, Ms. Pool directed me to stop writing sales quotes because it was "not [my] job." This instruction was in direct contradiction with Ms. Lugo's previous instruction that Outside Sales Reps should be writing sales quotes when possible, to help the Inside Sales team. Ms. Pool's reprimand was so inappropriate and public that multiple coworkers commented on it after the fact.

Second, on September 28, 2023, Ms. Pool and Ms. Lugo met with me purportedly to finally discuss my rebuttal email, but during that conversation they again refused to provide me with any examples of conduct justifying the behavioral allegations in the Corrective Action. In fact, the only example of improper behavior they could point to was from the week prior (nearly three months after the Corrective Action had been issued).

Instead, Ms. Pool and Ms. Lugo used this meeting to issue me increased work expectations. Specifically, they demanded that going forward I should conduct 17-25 customer meetings per week (an increase from my previous expectation of 12-15), and that I should be physically present in the showroom on every Monday and Friday (whereas I had previously only had to be in the showroom on Mondays). Neither Ms. Pool nor Ms. Lugo provided any justification for these revised expectations. I was shocked by this development. At the time, I had the highest sales volume for the Chicago showroom of any Inside or Outside Reps, and I was the only Outside Rep to have increased my sales over the previous year in the months of August and September. Despite that, I was the only Rep reporting to Ms. Lugo whose meeting expectations were increased or whose job requirements were changed.

Third, on October 10, 2023, I learned that Ms. Hirz had contacted AbsencePro (Respondent's third party leave administrator) and asked the company to change the start date for my FMLA leave from August 16, 2023 to August 15, 2023. I had taken a PTO day on August 15th and, ultimately, submitted an FMLA request and a supporting doctor's note for a medical leave to begin on August 16th. My FMLA approval letter reflects a leave start date of August 16th and my AbsencePro records did as well. However, Ms. Hirz attempted to get them to backdate the leave by one day so that Respondent could avoid having to pay my commissions for the month of August. I ultimately got the date changed back to accurately reflect my FMLA start date as August 16, 2023, but I have still not received my past-due commissions.

On October 11, 2023, I emailed Ms. Hirz expressing my frustration that my concerns regarding retaliation had still not been resolved and that, instead, the situation seemed to have deteriorated. I referenced my unpaid August commissions and what I had learned from

**EXHIBIT A**

AbsencePro about the request that my leave date be changed. I indicated that I felt I had exhausted all of my available options to resolve my employment concerns and, as a result, asked that the situation be escalated.

Ms. Hirz never responded to that email. Instead, two days later, Respondent terminated me.

Ms. Lugo and Ms. Hirz told me that I was being terminated because members of the sales team had observed me "staring at my computer for 3 hours" but that SalesForce did not show any activity on my behalf during that time. In other words, they appear to have terminated me for failing to be productive on one day for three hours. Neither Ms. Lugo nor Ms. Hirz investigated this allegation or even asked me what I had been doing during that time period.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/25/2024

**To:** Samantha Parreno
2247 W Medill Ave, Apt. 3F
Chicago, IL 60647

Charge No: 440-2024-04299

EEOC Representative and email: GRZEGORZ MUCHA
Investigator
grzegorz.mucha@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2024-04299.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
09/25/2024

Amrith Kaur Aakre
District Director

B

**Cc:**
Adam Dougherty
Ogletree Deakins
8117 PRESTON RD STE 500
Dallas, TX 75225

Jennifer Hirz
Perennials and Sutherland, LLC
1600 Viceroy Drive, Suite 500
Dallas, TX 75235

Jennifer Colvin
Ogletree Deakins
155 N WACKER DR STE 4300
Chicago, IL 60606

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2024-04299 to the

District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2024-04299 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# Parreno, Samantha

## OSMW-Outside Sales - Midwest

**Position ID -** MW7000334

**Reports To -** Lugo, Angela

**Department -** 313110-Chicago Showroom

**Business Unit -** MW7-Perennials & Sutherland

**Location -** CHSHW-Chicago Showroom

## REVIEW INFORMATION

### 2023 Annual Review

**Review Period -** 01/01/2022 to 12/31/2022

**Status -** Employee Acknowledged

**Target Completion Date -** 02/28/2023

## REVIEWER INFORMATION

**Reviewer -** Lugo, Angela

## INTRODUCTION

As we begin the new year, please take time to reflect on achievements and performance in 2022.

# QUESTIONS

## Instructions

Conducting performance reviews is a productive and meaningful activity that positively contributes to the success of Perennials and Sutherland.

**1 - What role do they have on the team and what impact have they had?**

**Category** - Performance

## Employee Response

The two things I enjoy the most are the people I get to work with and the product I get to sell.

I love working with creative design teams and being part of their design process. From initial specifications, to quoting, to installation, and finally to see their creative vision come to life, it is very inspiring!

I love our product! We truly sell "art" on every level, throughout every manufacturer. I feel lucky to be able to showcase our product and I am proud to stand behind it.

## Reviewer Response

In 2022 Samantha was promoted to OSR and has been focusing on driving sales in her territory. She works well with her clients and has built strong relationships. Her knowledge of our manufacturers allows her to provide guidance when requested. Her clients also trust her input and suggestions on their projects. Samantha also does well when given an objective or goal to achieve and will make her own action plan on how to achieve those goals.

**2 - Describe meaningful contributions they have made in the past year in their role.**

**Category** - Performance

## Employee Response

As our team has grown, I am proud to say that as part of the Inside team for the majority of the year, I have always been a reliable hand and have provided my colleagues with consistent support, training and education. I have established wonderful client relationships, and have played an essential role in the overall 2022 success of the Chicago showroom business.

I stepped into a new role this year as the OSR for T5. A major accomplishment for me was that I was able to have an increase over LY from September through December. When I stepped into the OSR role, T5 was at a 19% increase over LY. T5 finished the year with a 31% increase over LY. In a few short months, I was able to drive my business and end the year with a 12% increase from the time I stepped into this role through the end of

the year.

**Reviewer Response**

Samantha was promoted into her Outside Sales role in September 2022. She was able to grow the territory delivering results of +31% at $1,780,654 over 2021 having the best year to date in sales. Samantha was able to increase sales in territory 5 by 12% in less than five months. This led to T5 finishing the year with a +31% increase over LY. As the most tenured employee at the showroom Samantha has a wealth of knowledge of the history and inner workings of the showroom.

When Samantha first took over the territory her and her territory partner Cristiana had two larger quotes that we wanted to close before the end of the year. Samantha's focus and determination was to close Sarah Dippold's quotes which totaled $80,444 in sales between Liaigre, Ochre and Perennials.

**3 - What are some areas of focus or projects that could benefit them?**

**Category** - Performance

**Employee Response**

My goal by the end of this year is to have thriving client relationships within all states of my territory. I will nurture client relationships by earning their trust, providing guidance, being extremely responsive to all requests, under promising and over delivering, recognizing personal and professional success, providing consistent manufacturer education, and letting them know I value them and their business. I love to work within relationship-based selling because I truly cherish my clients and I am excited to establish many more relationships. Development of client relationships will segue into business growth and building a pipeline for the future!

**Reviewer Response**

A focus of 2023 for all team members will be presenting and selling all manufacturers we carry while maintaining the high standards of excellence in your territory. Focus brands such as Liaigre, Ochre, Berman Rosetti and Pavoni should be presented at all meetings and on MailChimp campaigns. Samantha should also continue to focus on using the Mailchimp platform to create email campaigns to market her territory.
Samantha has seen success with her client drop-ins and her build a room presentation. Using the Mailchimp platform will help increase her exposure to clients therefore increasing the meetings she schedules weekly with clients and ensuring there is always a strong pipeline.

A huge success that I would like to highlight is that T5 was the only territory that exceeded its sales goal. Some of the sales Samantha booked at the end of 2022 were quotes that existed before she took on the OSR role. However, she played an integral part in booking these quotes. This is important to note as I want Samantha to have the same achievements as last year in her territory and her experience and knowledge makes her more than capable of doing so.

Lastly, Samantha needs to build her confidence as she finds her way in her new role. Sam has the experience and knowledge to make a decision without needing to second guess herself. Leverage

your skills to build confidence when presenting to existing and new clients.

**4 - What are some positive interactions you have noticed between them and others? Or feedback you have received?**

**Category** - Performance

## Employee Response

I think my clients would say, I am knowledgeable, fun and think outside of the box. They know I am always available to help with any questions or concerns and that I will provide information accurately and effectively.

I think my collogues would say I am a knowledgeable, reliable and a team player. They know I am a strong communicator and express my thoughts and ideas clearly and respectfully.

## Reviewer Response

Samantha is excellent with clients. Her clients enjoy working with her and she has built strong relationships with many of the showrooms top clients over the years. As an example, Samantha worked hard to cultivate a relationship with Kamarron Design, a referral from one of our investors, and through this work was able to book a larger Perennials order. Her extensive product knowledge gives her a great advantage when meeting with clients as she is able to provide substantial amounts of information on all product.

## OVERALL COMMENTS

### Employee Response

I am very excited to be in the OSR role and I am looking forward to 2023! I have been an essential part of the Chicago showroom for the past (almost) 4 years and am looking to continuing my success and growing my territory.

### Reviewer Response

2022 was a whirlwind and met us with challenges that we did not face in 2021. Despite the challenges the showroom did manage to have its best year to date with closing $7,731,109 which was +6% over 2021 business on top of a 37% increase the year prior. Samantha's success in T5 was outstanding and had a great impact on the overall business.

Samantha continues to grow in her now role as an OSR and I have witnessed her become more comfortable when presenting to and working with clients. In 2023 I expect to see Samantha continue to grow and expand her knowledge and comfort level when meeting with existing and new clients. I also expect Samantha to continue working on her relationship with her territory partnership as her success and teams success are dependent on each other.

## EMPLOYEE ACKNOWLEDGEMENT

I hereby acknowledge that I have read and discussed this review with my manager. I understand that I may submit a comment which will be retained with this review.

| **Employee Signature** | **Acknowledgement Date** |
| --- | --- |
| Samantha Parreno | 02/24/2023 |

**Employee Comments**

I am looking forward to 2023 and excited to develop territory 5 business this year!

Ogletree Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
*Attorneys at Law*
155 N. Wacker Drive
Suite 4300
Chicago, IL 60606
Telephone: 312-558-1220
Facsimile: 312-807-3619
www.ogletree.com

Jennifer L. Colvin
(312) 558-3148
jennifer.colvin@ogletree.com

April 19, 2024

**Via Respondent Portal**
Greg Mucha
Federal Investigator
U.S. Equal Employment Opportunity Commission
230 S. Dearborn Street, Suite 1866
Chicago, IL 60604

RE: Samantha Parreno vs. Perennials and Sutherland
Charge No: 440-2024-04299

Dear Investigator Mucha,

This letter constitutes the position statement of Perennials and Sutherland LLC ("Perennials" or the "Company") in response to the Charge of Discrimination ("Charge") filed by Complainant Samantha Parreno ("Parreno" or "Complainant"). While acknowledging that the Equal Employment Opportunity Commission ("EEOC") may provide a copy of this position statement to Complainant, the Company considers all information it provides the EEOC in connection with the above-referenced Charge to be confidential and requests that the EEOC restrict any dissemination of the information provided during the course of this investigation to only those people with a need to know.[1] Toward this end, please provide me with prior written notice if any of the information provided to the EEOC is to be released by your agency to anyone outside the EEOC.

The Company denies Parreno's allegations and denies any liability related to her employment with and termination from the Company. For all of the reasons discussed herein, the Company

[1] This response is intended to assist the EEOC in its investigation of this Charge. This position statement is based upon the Company's understanding of the facts at this time. While the information contained herein is believed to be true and accurate, this position statement does not constitute an affidavit and is not intended to be used as evidence of any kind in any agency or court proceeding in connection with the above-referenced Charge or any other matter. Inclusion of information in this response does not constitute the waiver of any objection to the Charge or any other legal theory that the Company may assert in the future. By submitting this position statement, the Company does not waive its right to present new or additional facts or arguments based upon subsequently acquired information or evidence.



D

respectfully requests that the EEOC find a lack of substantial evidence to support Parreno's Charge and dismiss it in its entirety.

## I. FACTUAL BACKGROUND

### A. Perennials and Sutherland is an Equal Opportunity Employer

The Perennials companies are worldwide icons and acknowledged trailblazers in the international design industry. Founded by David and Ann Sutherland, who share an ingenious talent for curating the finest interior and exterior collections, the Company creates luxury furniture, fabrics, rugs, and accessories of premier quality. Representing both it owns lines of furniture, in addition to third-party lines, Respondent operates full-service showrooms catering to the professional design market with multiple locations across the United States and globe. Innovation, unique design, and collaborative thinking comprise the Company's brand DNA that can be found in any facet of the corporation, from day-to-day operations to aesthetic.

Respondent is proud of its commitment to fair employment practices, and being an equal opportunity employer regardless of disability, race, color, ancestry, religion, sex, national origin, sexual orientation, age, citizenship, marital status, gender identity, veteran status, or any other protected class. It firmly believes its strength is derived from the talents, ideas, and experiences of a diverse workforce. To that end, the Company has implemented an equal employment opportunity ("EEO") policy that prohibits discrimination on the basis of race, disability, national origin, sex, and religion, among many other protected characteristics. The EEO policy is included in the Employee Handbook and employees have access to the Employee Handbook throughout their employment with the Company. Additionally, the Employee Handbook contains anti-harassment and anti-retaliation policies as well as a description of the reporting mechanisms for employees who experience or witness discrimination, harassment or retaliation. (*See* Equal Employment Opportunity Policy, **Exhibit A.**)

### B. Parreno's Employment at the Company

Perennials hired Parreno for an Inside Sales – Chicago role in April 2019. This role was based out of the Chicago showroom. In 2022, Parreno began working as an Outside Sales Consultant. She took maternity leave in 2021 and returned to the same role. Contrary to her allegations, she was not treated differently during her first pregnancy. Nor can she assert such claims in this Charge based on alleged conduct that took place more than 300 days before she filed the Charge.

### C. Parreno's Performance Deficiencies

As an Outside Sales Consultant, Parreno was permitted to work from home frequently, but was expected to manage her client relationships through Salesforce during that time. She was also expected to work in the show room occasionally to stay up to speed on products and sales processes. (*See* Outside Sales Consultant Job Description, **Exhibit B.**) When she went to work in person in the show room, like all others working in the show room, Parreno was expected to assist clients.

Parreno's supervisor, Angela Lugo ("Lugo") coached her repeatedly on her inactivity. For example, on May 5, 2023, Parreno and Lugo discussed the requirement that Parreno use Salesforce daily to document her meetings and other interactions with clients and prospective clients. Lugo noted that there had been multiple days with zero activity by Parreno.

Around June 2023, the Company informed Parreno and her colleagues they needed to work one day a week in the showroom to connect with the showroom staff. Parreno was not happy with this expectation and asked to meet with her supervisor, Lugo, to discuss it. On June 29, 2023, Parreno and Lugo met by Teams to discuss Parreno's concerns. Parreno told Lugo she was frustrated because she did not want to work from the showroom one day per week, and felt she was the only person in the showroom who did any work. This is of course untrue, as Parreno worked alongside colleagues in the showroom who also helped clients. At no time during this meeting (or at any other time) did Parreno reveal she was pregnant, as she alleges.

Parreno told Lugo she was going to visit clients that afternoon. However, she logged off after the call and her account showed no subsequent activity that day. Parreno also failed to respond to clients who contacted her that day until July 5, 2023. Parreno informed the clients she had been out of town, but she took a sick day on June 30 and did not request PTO or have any time off approved during the rest of that timeframe. Her account confirmed that she had been inactive for several days.

On or about July 11, 2023, the Company issued Parreno a corrective action that addressed multiple instances of her poor performance and inactivity at work. (*See* Signed Corrective Action, **Exhibit C**.) Parreno failed to take any responsibility for her many days of low or no activity. Instead, she emailed Lugo and Emily Pool, National Sales Director, contesting the written warning and asking that Lugo and Pool provide examples of behavioral concerns. (*See* July 12, 2023 Email, **Exhibit D**.) Notably, Parreno did not reveal she was pregnant in this email, or complain about any discrimination.

**D. Parreno's Leave of Absence**

On August 14, 2023, Parreno informed Lugo that she had an emergency medical procedure that day and would be out of work until September 5, 2023. Parreno did not provide any information about the nature or reason for the medical procedure. (*See* August 14, 2023 Email and Medical Note, **Exhibits E and F**.) Based on this information, the Company started her non-FMLA medical leave on August 15, 2023. The Company's third party leave administrator also approved the leave beginning on August 15.

Later, Parreno submitted amended paperwork indicating her leave began on August 16 and the third party administrator revised the date on which her leave began. The Company believes Parreno realized she would not be eligible for commissions had her leave began on August 15 and she submitted amended paperwork to qualify for commissions. Contrary to her assertions, the Company never changed the leave date in retaliation for Parreno taking leave. Rather, the approved leave dates were based entirely on the third party administrator's analysis of the doctor's notes.

While, the third-party administrator approved leave beginning August 16, the fact remains that Parreno did not work on August 14 of August 15[2].

The Company also did not know the reason for Parreno's leave, as all relevant medical information was provided directly to the third party administrator and not discussed with Lugo or others at Perennial. This is evident based on emails between Jennifer Hirz, Sr. Director – Human Resources, and Parreno between August 15 and September 19, 2023, in which Hirz provides Parreno with directions on initiating a leave of absence and they communicate about Parreno's return to work. Hirz notes to Parreno that they do not see her medical documentation and nowhere does Parreno reveal that she has experienced a miscarriage. (*See* Emails, **Exhibit G.**)

Parreno requested and the third party administrator granted an additional two weeks of leave. She returned to work on September 20, 2023.[3] Despite not requesting any accommodations when she returned to work in September, Parreno told Lugo she was "easing" back into work on September 20. She also said she was uncomfortable explaining why she had been on leave or was easing back to work—showing she never revealed her pregnancy or miscarriage or any mental health diagnoses to Lugo or anyone else. (*See* Teams Message, **Exhibit H.**)

**E. Parreno's Continued Performance Deficiencies**

On September 22, Parreno asked to attend an important in-person showroom meeting by Teams because she was overwhelmed by her workload. Lugo told her she needed to attend in person, but that she would help her triage her work when they met. Despite knowing she did not have permission to attend the meeting virtually, Parreno attended by video.

After she returned to work, Parreno requested a meeting to discuss the July 11 Corrective Action. Lugo and Pool met with Parreno on September 28, 2023. Parreno's chief complaint was that Pool and Lugo did not share her July 12 rebuttal email with Hirz. Lugo and Pool explained they did provide the email to Hirz. Parreno then claimed that Lugo and Pool did not respond to her rebuttal email by providing additional examples of her performance gaps and behaviors. Lugo and Pool noted that they were not sharing specific details about behavioral issues in order to protect the confidentiality of employees that had reported the concerning behaviors listed in the corrective action. To illustrate behaviors that were not in line with expectations, Lugo referenced Parreno's decision to ignore her directive to attend the September 22 meeting in person. Parreno explained she did not attend in person because she did not want to explain her leave of absence to the showroom manager. No one told Parreno she had to give this explanation and no member of management ever inquired to Parreno why she had been on a leave.

---

[2] Contrary to Parreno's representation, she did not take a PTO day on August 15.

[3] In her Charge, Parreno appears to assert that the Company interfered with her use of FMLA. However, Parreno was not FMLA eligible because Parreno did not work out of a location with 50 employees in a 75 mile radius. Parreno was well aware that her approved leave was a non-FMLA medical leave. But even if FMLA did apply to her leave, Parreno cannot bring an FMLA interference claim at the EEOC.

Because it was apparent that Parreno was not taking responsibility for her performance deficiencies, during the meeting on September 28, Lugo and Pool discussed Parreno's performance gaps and gave Parreno a list of reasonable tasks to complete in order to meet expectations. Parreno was expected to perform 12-15 formal meetings on average per week with either current or prospective clients; perform 5-10 "bird calls" to clients per week by dropping off materials, scheduling future presentations, or updating client libraries; participate in weekly showroom meetings; and routinely review and update her projects in Salesforce to reflect information obtained during client meetings and calls. Parreno also understood she was expected to maintain professionalism at all times, take initiative to drive her business, work in the showroom on either Mondays and Fridays (along with all other Outside Sales Consultants), and attend a weekly meeting with Lugo. These duties were expected of all Outside Sales Consultants. (*See Exhibit B.*) Contrary to Parreno's claims, she was not given increased expectations and her job requirements were not changed.

Unfortunately, Parreno did not meet these clearly defined expectations. During the first week of October, she did not turn in a required weekly recap on time, failed to log sufficient meetings, failed to schedule an expected meeting with Lugo and ignored Lugo's calls and voicemails for several days. She only logged three meetings the week of October 10, did not take initiative to drop off samples or visit clients, did not record any "bird calls," and did not update her Projects in Salesforce to reflect that she was meeting with clients.

Because Parreno failed to meet her job expectations, and showed no effort to improve by meeting the clearly defined requirements of her position, the Company terminated her employment on October 13, 2023.

Though Parreno complained about her job expectations and the July write up, she never raised any concerns about discrimination or retaliation. Nor would any such complaints have had any merit, as no one who made decisions about Parreno's employment knew she was pregnant or experienced a miscarriage in 2023.

## II. LEGAL ANALYSIS

Parreno cannot establish a claim for either pregnancy discrimination or retaliation because the relevant decision-makers never knew she was pregnant, that she experienced a miscarriage, or the reason for her leave of absence. This fact is fatal to her claims. Even if Parreno could establish that Perennials was aware of her pregnancy, her claim would fail.

For the purposes of a pregnancy discrimination claim, Parreno must first establish that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her job duties satisfactorily; (3) she was terminated; and (4) similarly situated, non-pregnant employees were treated more favorably. *See Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp. 2d 913, 918 (N.D. Ill. 2013). Parreno cannot meet this *prima facie* case because she never disclosed her pregnancy. Nor can she show that she was adequately performing her job duties or that other non-pregnant employees were treated more favorably.

Parreno cannot establish a retaliation claim for similar reasons. To make out a *prima facie* case, she must demonstrate that (1) she engaged in statutorily protected activity; (2) she experienced an adverse action; and (3) there is a causal link between the activity and the adverse action. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). Parreno's claim fails because she cannot show she engaged in any statutorily protected activity – as she never raised any concern that she was being subjected to discrimination or retaliation. Similarly, any connection between her leave and subsequent termination, as, again, none of the relevant decision makers knew why she took leave from work. Further, even if Parreno had engaged in a protected activity, there is no causal link to her termination. As shown herein, Parreno was terminated for consistently failing to meet performance and behavioral expectations. Accordingly, all of Parreno's claims fail.

## III. CONCLUSION

As set forth herein, Complainant, Samantha Parreno, cannot establish her claims of pregnancy discrimination or retaliation. Accordingly, the EEOC should dismiss Complainant's Charge in its entirety. Should you need any additional information, please do not hesitate to contact me.

Sincerely,

Jennifer L. Colvin

Enclosures (Exhibits A-H)

PERENNIALS

SUTHERLAND

PERENNIALS AND SUTHERLAND L.L.C.

August 15, 2023

Samantha Parreno
[redacted]

Dear Samantha:

**Medical Leave and Short-Term Disability Details**
On August 14, 2023, you notified Angela Lugo of your need to take a leave of absence until approximately September 5, 2023. Based on your length of service, you have met the eligibility for Medical Leave, which provides the right to take up to 12 weeks of unpaid leave. Additionally, you have enrolled in the benefit of Short-Term Disability, which, with medical designation and approval by Mutual of Omaha, would run concurrently with Medical and will serve as the pay replacement for the amount of time within the 12 weeks that is certified as medically disabled. After a one week waiting period, for which you can use available Sick and PTO, Short-Term Disability (STD) will pay up to 60% of your weekly base salary, up to $1,500 per week (non-taxable). Refer to Benefits Guide for more information.

**How to Apply for Leave**
We have partnered with AbsencePro, a division of Mutual of Omaha, to manage our leaves of absence. I have attached a flyer with step-by-step instructions on applying for the leave and going through the process with your doctor and Mutual of Omaha. Once you apply with them, they will also connect you with the Short-Term Disability unit of Mutual of Omaha to review, approve and coordinate your disability payments. We suggest that you apply for leave with AbsencePro as early as possible in the process to allow time to gather all required paperwork from your medical provider and to be able to have all of your questions answered. We also suggest that you use a personal email address, as you will receive email notifications after your leave begin that you will need to respond to promptly through the AbsencePro portal.

E

**Benefits and Time Off While on Leave of Absence**
While you are on leave, Perennials & Sutherland will continue to pay its portion of the cost of your benefits, while you will be responsible for paying for your portion of the employee premiums. You will also have the option of repaying your benefit premiums when you return from leave through your regular bi-weekly paychecks.

As stated in the PTO and Sick policies, benefits such as vacation, sick, and holidays will not accrue while you are on a leave of absence. You may use your available PTO and Sick during the non-paid portion of your leave (waiting period and bonding time after period of medical disability ends). Enter the desired time off directly into ADP for your manager to approve or HR can enter the time directly into your timecard on your behalf.

**Returning to Work after Your Leave Ends**
As your return to work date gets closer, you will need to enter your return-to-work release from your doctor and return date into the AbsencePro portal. Please allow sufficient time to communicate with your doctor to obtain this information. Also, remain in contact with your manager and HR before your return. If you are unable to return by the end of your leave, you must request an extension of the leave, in writing, five days prior to the leave expiration date.

We hope this letter answers most of your outstanding questions about your upcoming leave. If you have any questions or need anything from us in the meantime, please contact us at [redacted]

Sincerely,

Jennifer Hirz
Sr Director Human Resources

Attachments:
AbsencePro Flyers
Short-Term Disability info from Benefit sGuide

Mutual Solutions

# AbsencePro Employee Experience

AbsencePro provides you with quick access to experts who will answer questions, review guidelines and provide information regarding a job protected medical or family leave of absence.

## Submit Your Leave | 15 Minutes

- Submit your FMLA/short-term disability (STD) leave information to the Absence Management Team via online or phone
- Absence Management Team handles the FMLA claim and completes the STD intake questions

**Employee Submits Info to Absence Management Team**

## Physician Completes Medical Documents

Your physician must complete within 15 days the medical certification document and attending physician statement

- Absence Management Team sends to your physician OR
- You provide the documents to your physician

You or your physician sends the completed medical documents to the Absence Management Team

**Physician Submits Info to Absence Management Team**

## Absence Management Team Reviews Documents

Absence Management Team receives the completed documents and reviews them in order to render a decision

**Absence Management Team Reviews Info**

## Absence Management Team Renders Decision 5 Business Days*

You are then notified of the decision via phone, email or mail and provided with next steps, if necessary

**Absence Management Team Notifies Employee**

**GET STARTED!**

Call: 877-365-2666 | Online: AbsencePro.absencemgmt.com

TDD: 800-697-0353 | Fax: 877-309-0218

Mutual of Omaha

*Estimation; Once the Absence Management Team receives all completed documentation

263213

39665978

Mutual Solutions

# AbsencePro℠ Claim Submission Checklist



The following are step-by-step instructions on what you need to do to apply for a leave of absence.

## Step #1:

Contact AbsencePro℠ to notify your need for a leave by either the AbsencePro℠ website or by phone:

Website: AbsencePro.absencemgmt.com
Phone: 1-833-743-8185, Monday – Friday 7:30 a.m. – 9:00 p.m. CST

## Step #2:

Receive the Medical Certification Form from either your Leave Notification Packet sent by AbsencePro or download from AbsencePro.absencemgmt.com.

- The Medical Certification Form is time sensitive material. Be certain to check for the certification due date on your initial request letter provided in your FMLA Notification Packet.

## Step #3:

Take the blank Medical Certification Form to either your or your family member's Health Care Provider.

- If your leave is not for medical reasons, please follow the instructions provided by the AbsencePro Specialist and/or your Leave Notification Packet.

## Step #4:

Ensure that AbsencePro received the completed Medical Certification Form prior to the certification due date. It is your responsibility to ensure paperwork gets returned in a timely fashion. If there are delays completing your forms, be sure to contact AbsencePro prior to your certification due date.

Return the completed Medical Certification Form to AbsencePro:

Fax: 1-877-309-0218
Email: Support@AbsencePro.absencemgmt.com
Address: NBC Tower – 13th Floor, 455 N. Cityfront Plaza Drive, Chicago, IL 60611-5322

## Step #5:

Receive and review the Decision Letter from AbsencePro. Please note the decisions are based on the certification completed by the health care provider. Notify AbsencePro if your leave was denied and you need clarification on next steps.

## Step #6:

If approved for the leave, you will be responsible for keeping track of your available entitlement:

- **Intermittent Frequency Leave:** Be sure to report each intermittent FMLA absence to AbsencePro within 24 hours and follow your department's call-off procedures. All prescheduled appointments need to be tracked ahead of time with both AbsencePro and your company. Failure to call off to both parties may be subject to disciplinary action.
- **Continuous Frequency Leave:** Pay close attention to the date range on your Decision Letter. Your position at your company is only protected during that date range. To keep your entitlement accurate and ensure protection, please notify AbsencePro if your leave is any different than what was provided on the Decision Letter.

Mutual of Omaha

AbsencePro℠ is administered by FMLASource, Inc., an affiliate of ComPsych Corporation. ComPsych is solely responsible for the administration of FMLA services. Mutual of Omaha Insurance Company and its affiliates are authorized to provide marketing services, including sales and enrollment. Mutual of Omaha Insurance Company and ComPsych are independent, unaffiliated companies.

187321

# Short-Term Disability

Perennials and Sutherland, LLC. offers a short-term disability (STD) option through Mutual of Omaha Insurance Company. If you enroll in this voluntary benefit and you become disabled due to an illness or injury, this plan will pay you **60%** of your weekly base salary up to $1,500/week. The benefit begins after 7 days of injury or illness and lasts up to 25 weeks. Mutual of Omaha's STD plan has a 12/12 pre-existing condition limitations. Meaning, the plan will not cover conditions treated within the 12 months prior to the effective date of coverage during the initial 12 months of coverage. Please see the summary plan description for complete plan details or contact Human Resources for specific benefits.

| Short-Term Disability | |
|---|---|
| Weekly Maximum Benefit | $1,500 |
| Elimination Period (you will not be paid during this time) | 7 Days |
| Maximum Benefit Period | 180 Days |
| Pre-Existing Condition | 12/12 |

**Monthly Voluntary STD Rates**

| Age | <25 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70+ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee | $0.55 | $0.55 | $0.50 | $0.45 | $0.41 | $0.43 | $0.47 | $0.57 | $0.67 | $0.76 | $0.84 |

**Monthly Employee Contribution Calculation**

| Annual Salary | | Weekly Income | | Weekly Benefit | | | | Monthly Premiums |
|---|---|---|---|---|---|---|---|---|
| $ | ÷ 52 = | $ | x .60 = | $ | ÷ 10 = | $ | x STD Rate | $ |

# Long-Term Disability

As a part of your total compensation package, Long-Term Disability (LTD) benefits are provided to you by Perennials and Sutherland, LLC. This employer paid benefit replaces 60% of your income if you become partially or totally disabled for an extended period of time. Certain exclusions, along with any pre-existing condition limitations, may apply. Mutual of Omaha's LTD plan has a 12/12 pre-existing condition limitations. Meaning, the plan will not cover conditions treated within the 12 months prior to the effective date of coverage during the initial 12 months of coverage. Please see the summary plan description for complete plan details or contact Human Resources for specific benefits.

| Long-Term Disability | |
|---|---|
| Monthly Maximum Benefit | $10,000 |
| Elimination Period (you will not be paid during this time) * | 180 Days |
| Maximum Benefit Period | Payments will last for as long as you are disabled or until you reach your Social Security Normal Retirement Age, whichever is sooner. |
| Pre-Existing Condition | 12/12 |

*if you enroll in the STD plan it will cover this unpaid LTD elimination period

***DISABILITY INSURANCE***

This short video provides an overview how Disability Insurance works and how the benefits can help offset your healthcare expenses while you are not able to work due to an illness or sickness.



**Per Mutual of Omaha certificate:**
A Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

MUTUAL of OMAHA

[redacted]
AbsencePro.absencemgmt.com

Attn: David Sutherland, LLC

Leave Request # 4658459

9/1/2023

Samantha Elizabeth Parreno
[redacted]

Dear Samantha Elizabeth,

This letter confirms decisions made regarding your recent request(s) for leave from your position at David Sutherland, LLC for your own serious health condition. The following are the most recent decisions for your current leave request and are based on certification completed by your healthcare provider:

Below you will see detail around the requested time.

- Details may relate to your recent request and/or from previously-requested time, and may include dates that are already approved.
- The time requested may be denied, pending or approved. The categories below will explain which parts of your requested leave are in which status.

**The following dates are approved:**

| | | |
|---|---|---|
| On Continuous Leave | Beginning on 8/16/23 | Ending on 9/5/23 |
| Decision = Approved | Decision Reason = | |
| Estimated frequency of absence: On a continuous basis | | |
| Applicable Leave Plan(s): FMLA | | |

## What You Need To Know

Based on the continuous and/or reduced leave(s) approved above, the anticipated amount of entitlement used for this leave will be: 3.00 weeks (120.00 hours) for this request.

The Family and Medical Leave Act (FMLA) allows eligible employees up to a total of 12 weeks of unpaid leave in a 12-month period for certain qualifying reasons. If your leave is approved and you have FMLA time available, you will be entitled to job protection under the FMLA for the dates listed above (see "beginning on" and "ending on") and your time off work will reduce your available FMLA balance. Your employer will maintain your health benefits under the same conditions as if you continued to work. If you do not return to work following FMLA for a reason other than (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA; or (2) other circumstances beyond your control, you may be required to reimburse your employer for their share of health insurance premiums paid on your behalf.

F

If your leave is supplemented by a pay replacement benefit (for example short term disability, worker's compensation and/or paid time off) that benefit will run concurrently with your leave.

## What You Need To Do

**Provide a fitness-for-duty certification upon your return from continuous or reduced schedule leave for your own health condition.** In order to be restored to your job, you must present to your employer certification from your doctor stating that you are fit to return to work.

**Notify AbsencePro℠ if your leave changes.**
If, for any reason, your condition or status changes significantly while on FMLA leave, please notify AbsencePro℠ immediately.

Should you have any questions, please contact AbsencePro℠ by sending an email to [redacted] or call us toll free at [redacted]. Please reference your leave request number # 4658459 when you contact us. You may also find information and review your leave status on our website at AbsencePro.absencemgmt.com. To access your record, please visit our website and create a username and password. You must have your employee ID number and the postal code (60647) on file with your employer to register. We are working to provide you with excellent service during your leave.

Best Regards,

AbsencePro℠

cc:

# Your Rights & Responsibilities Under the Family & Medical Leave Act

FMLA requires covered employers to provide unpaid, job protected leave to "eligible" employee for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year and for 1,250 hours over the previous 12 months, work at a site with at least 50 employees within 75 miles, and have leave time available.

**Reasons for taking leave:**
FMLA requires covered employers to provide up to 12 work weeks of unpaid, job-protected leave during a single, 12-month period rolling backward:

- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son, daughter, or parent who has a serious health condition;
- To address certain qualifying exigencies arising from employee's spouse, son, daughter, or parent on active duty or call to active duty in the National Guard or Reserves in support of a contingency operation;
- For incapacity due to pregnancy, prenatal medical care, or post-partum recovery;
- For a serious health condition that makes the employee unable to perform their job.

Qualifying exigencies may include attending certain military events, arranging for alternative child-care or parental care, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post deployment reintegration briefings.

**Use of Leave**
The employee does not need to use this leave entitlement in one block. When medically necessary, leave may be taken on an intermittent or reduced-schedule basis. Employees must make reasonable efforts to schedule leave for planned medical treatment so as to not unduly disrupt the employer's operations.

**Definition of a Serious Health Condition**
A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Benefits and Protections**
While on FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work.

Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA cannot result in the loss of any employment benefit that accrued prior to the start of the employee's leave.

**Substitution of paid leave for unpaid leave**
Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

**Employee Responsibilities**
Employee must provide 30-days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedure.
Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health-care provider, or the circumstances supporting the need for military family leave.
Employees must also inform their employer if the requested leave is for a reason for which FMLA leave was previously taken or certified.
Employees may also be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**
Covered employers must inform employees requesting leave whether they are eligible under FMLA. If the employee is eligible, the notice must specify any additional information required along with a copy of this notice. If the employee is not eligible, the employer must provide a reason for the ineligibility.
Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**
FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA;
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or related to FMLA.

**Enforcement**
The employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer. FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

**For Additional Information**
Please contact the nearest office of the Wage and Hour Division, listed in most telephone directories under US Government – Department of Labor, or contact your human resource department.

From=[redacted]
Sent=Fri Sep 01 18:26:26 CDT 2023
To=[redacted]
Subject=Intake Transmission for Samantha Elizabeth Parreno
Enclosed is the Intake information for Samantha Elizabeth Parreno
[Employee Number: MW7000334 ] at David Sutherland, LLC

Employee's Work State / Province: Illinois
DISCLAIMER: The information contained in this e-mail may be confidential and is intended solely for the use of the named addressee. Access, copying or re-use of the e-mail or any information contained herein by any other person is not authorized. If you are not the intended recipient please notify us immediately by returning the e-mail to the originator.

G

# FMLASource Disability Intake Transmission

## Intake Snapshot

| | |
|---|---|
| Intake Date and time: | 9/1/2023 3:31:19PM |
| FMLASource Intake Representative: | [redacted] |
| Adjusted Intake? | Yes |
| Claim Initiated by | Employee |
| Requested by Name | |
| Summary Status | Approved |

## Eligibility File Feed

## Employee Demographic and Contact Information

| | |
|---|---|
| Employee Full Name: | Samantha Elizabeth E Parreno |
| SSN: | [redacted] |
| Date of Birth: | [redacted] |
| Gender: | Female |
| Postal Address: | [redacted] |
| Home Phone: | |
| Mobile Phone: | [redacted] |
| Work Phone: | |
| Personal Email: | [redacted] |
| Work Email: | |
| Alternate Email: | |
| Other Email: | |

## Employee Position Information

| | |
|---|---|
| Job Title: | OSMW - Outside Sales - Midwest |
| Date of Hire: | 05/13/2019 |
| Employee ID | MW7000334 |
| Adjusted Hire Date: | |
| Date of Termination: | |
| Employee Group 2: | |
| Full/Part Time: | Full-time |
| Employee Group 3: | Salary |
| Hours Worked/Week: | 40.00 |
| Employee Group 4: | |
| Employee Group 5: | |
| Employee Group 1: | EXEMPT |
| Employee Group 6: | |

## Work Location Information

| | |
|---|---|
| Account Name: | David Sutherland, LLC |
| Work Location: | CHSHW Chicago Showroom -- 222 Merchandise Mart -- Chicago -- Illinc |
| Work State: | Illinois |
| Business Unit: | 313110 - Chicago Showroom |
| Organization: | CHSHW - Chicago Showroom |
| Vendor Identifier: | G000BQRB |

## Contact Information

| | |
|---|---|
| Employer Contact: | |
| Employer Contact Job Title: | |
| Employer Contact Phone: | |
| Employer Contact Work Email: | |
| Employer Contact Type: | |

## Disability Eligibility Information

| | |
|---|---|
| Leave Reason | Employee's Serious Health Condition |
| Weekly STD Earnings: | [redacted] |
| STD Eligibility: | 05/13/2019 |
| LTD Eligibility: | |
| Estimated Begin Date: | 08/16/2023 |
| Estimated End Date: | 09/04/2023 |
| Employee Reported Workers Comp: | No |
| HR Verified Workers Comp: | No |
| Last Date Worked: | 08/15/2023 |
| Condition & Details | Other, SHC |

## Health Care Provider Information

| | |
|---|---|
| Health Care Facility Name: | |

| | |
|---|---|
| Health Care Provider's First Name: | [redacted] |
| Health Care Provider's Last Name: | [redacted] |
| Specialty: | |
| Credential: | Medical Doctor (MD) |
| HCP Phone: | [redacted] |
| HCP Fax: | [redacted] |

**Partner Intake Questions**

| | |
|---|---|
| If surgery, please provide date of surgery? | |
| Is this a recurrent condition? If yes, when did it begin? | no |
| Hours worked on last day | 8 |
| Date first unable to work: | 08/16/2023 |
| Date of first appointment for this disability: | 8/16/2023 |
| Date of next appointment related to disability | 8/16/2023 |
| What is your actual or estimated disability end date? | 09/05/2023 |
| Estimated return to work date: | 09/06/2023 |
| Is your condition the result of an accident or illness? | n/a |
| Details? - if claim is for Maternity, please indicate N/A | |
| Is the condition the result of a motor vehicle accident? | no |
| If yes, is there an accident report? - if claim is for Maternity, please indicate N/A | |
| Has a workers comp claim been filed or in the process of being filed? Have you received workers comp benefits? Are you appealing a workers comp decision? (Please include any and all details.) - if claim is for Maternity, please indicate N/A | no |
| Will you be hospitalized due to this condition? | No |
| If yes, what were the hospitalization dates? | |
| If leave is for maternity, date of last menstrual period? | |
| Pre-natal or post-partum complications | |
| Please provide any additional comments: | Healthcare provider certified dates 08/16/2023 to 09/0/52023 |

Please be advised that these questions may be used to initiate additional claims on your behalf. You may be contacted by a representative of Mutual of Omaha in the near future. The representative will verify the information that has been gathered by AbsencePro in your submission for your leave request, as well as gather additional information needed to review your claim for paid benefits. It would be of great benefit to supply the representative with as much information as possible regarding your leave. Please be aware that a leave request or completed application for additional coverages does not guarantee benefits. Eligibility and certain policy provisions may exclude you from benefits.

PERENNIALS

SUTHERLAND

PERENNIALS AND SUTHERLAND L.L.C.

# Annual Outside Sales Representative Commission and Incentive Plan

Salesperson: Samantha Parreno

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | [redacted] | | [redacted] | | [redacted] | | | |
| [redacted] | | | | | | | | |
| [redacted] | | | | | | | | |

[redacted]

- [redacted]
- 
- 
- [redacted]

| | | | | |
|---|---|---|---|---|
| [redacted] | | | | |
| | | | [redacted] | |
| [redacted] | | | | |
| [redacted] | | | | |
| [redacted] | | | | |
| [redacted] | | | | |
| [redacted] | | | | |
| [redacted] | | | | |
| [redacted] | | | | |

[redacted]

| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |



H

PERENNIALS

SUTHERLAND

PERENNIALS AND SUTHERLAND L.L.C.

[redacted]

Effect of Leave of Absence

If employee goes on leave of absence, they will be eligible for monthly commission only if they are actively employed on the 15th day of the month, in which case, they will be eligible for the full month. If employee returns from leave of absence they will be eligible for monthly commission only if they return to work by the 15th of that month and will receive commissions for the full month.

[redacted]

**From:** Jennifer Hirz <[redacted]>
**Sent:** [redacted]
**To:** Samantha Parreno <[redacted]>
**Subject:** [redacted]

Good morning Samantha,

[redacted]

[redacted] You entered 8 hours of PTO for 8/15/23 [redacted]

[redacted]

Sincerely,
Jennifer

Jennifer Hirz
Sr HR Director
[redacted]

I

## Requests

Request time off

Select filters...

Refresh list

[redacted]

[redacted] [redacted]

[redacted]

Salary PTO - PTO Approved

Aug 15, 2023 (8:30 AM, 8 Hours)

Submitted On: Aug 15, 2023

J

2020-1057

**Illinois Department of Employment Security**

[redacted]

www.ides.illinois.gov

NC2X00YW008967010200

SAMANTHA E. PARRENO 9 / 8967

[redacted]

Date Mailed: 11/07/2023
Claimant ID: 4266339

## Determination

[redacted]

[redacted]

Based on all the determinations regarding your claim, you are eligible for benefits as long as you meet the eligibility requirements.

Please read each determination carefully as it may include benefit reductions.

Issue 004 602A - Misconduct
Allow Effective 10/15/2023 - 12/31/9999
Was the claimant discharged for misconduct connected with the work? The evidence shows the claimant was discharged from DAVID SUTHERLAND INC. because she showed no activity on Salesforce for 3 hours. Since the claimant's action, which resulted in her discharge was not a violation of a reasonable rule or policy of the employing unit, the claimant is not ineligible for benefits from 10/15/2023 in regard to this issue.

[redacted]

[redacted]

[redacted]

[redacted]



K

MUTUAL of OMAHA

455 N. Cityfront Plaza Drive, 13th Floor
Chicago, IL 60611-5322
Phone: 877-365-2666
Fax: 877-309-0218

AbsencePro.absencemgmt.com

Attn: David Sutherland, LLC

Leave Request # 4658459

10/10/2023

Samantha Elizabeth Parreno
2247 W. Medill Ave
#3F
Chicago, IL 60647

Dear Samantha Elizabeth,

This letter confirms decisions made regarding your recent request(s) for leave from your position at David Sutherland, LLC for your own serious health condition.

Below you will see detail around the requested time.

- Details may relate to your recent request and/or from previously-requested time, and may include dates that are already approved.
- The time requested may be denied, pending or approved. The categories below will explain which parts of your requested leave are in which status.
- There are different leave laws, regulations or plans that apply to the time you requested. These are noted in the "Applicable Leave Plan(s)" boxes. Note that the time may apply under one or more of the laws, plans, etc.

**The following dates are approved:**

| | | |
|---|---|---|
| On Continuous Leave | Beginning on 8/15/23 | Ending on 9/5/23 |
| Decision = Approved | Decision Reason = End of Leave Unconfirmed | |
| Estimated frequency of absence: On a continuous basis | | |
| Applicable Leave Plan(s): Non-FMLA Medical Leave | | |

| | | |
|---|---|---|
| On Continuous Leave | Beginning on 9/6/23 | Ending on 9/19/23 |
| Decision = Approved | Decision Reason = End of Leave Unconfirmed | |
| Estimated frequency of absence: On a continuous basis | | |
| Applicable Leave Plan(s): Non-FMLA Medical Leave | | |

**The following dates are denied:**

| | | |
|---|---|---|
| On Continuous Leave | Beginning on 8/16/23 | Ending on 9/19/23 |
| Decision = Denied | Decision Reason = Ineligible - Worksite Exemption | |

L

Applicable Leave Plan(s): FMLA

## What You Need To Know

The Family and Medical Leave Act (FMLA) allows eligible employees up to a total of 12 weeks of unpaid leave in a 12-month period for certain qualifying reasons. If your leave is approved and you have FMLA time available, you will be entitled to job protection under the FMLA for the dates listed above (see "beginning on" and "ending on") and your time off work will reduce your available FMLA balance. Your employer will maintain your health benefits under the same conditions as if you continued to work. If you do not return to work following FMLA for a reason other than (1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA; or (2) other circumstances beyond your control, you may be required to reimburse your employer for their share of health insurance premiums paid on your behalf.

If your leave is supplemented by a pay replacement benefit (for example short term disability, worker's compensation and/or paid time off) that benefit will run concurrently with your leave.

## What You Need To Do

**Provide a fitness-for-duty certification upon your return from continuous or reduced schedule leave for your own health condition.** In order to be restored to your job, you must present to your employer certification from your doctor stating that you are fit to return to work.

**Notify AbsencePro℠ if your leave changes.**
If, for any reason, your condition or status changes significantly, please notify AbsencePro℠ immediately.

Should you have any questions, please contact AbsencePro℠ by sending an email to Support@AbsencePro.absencemgmt.com or call us toll free at 877-365-2666. Please reference your leave request number # 4658459 when you contact us. You may also find information and review your leave status on our website at AbsencePro.absencemgmt.com. To access your record, please visit our website and create a username and password. You must have your employee ID number and the postal code (60647) on file with your employer to register. We are working to provide you with excellent service during your leave.

Best Regards,

AbsencePro℠

cc:

# Your Rights & Responsibilities Under the Family & Medical Leave Act

FMLA requires covered employers to provide unpaid, job protected leave to "eligible" employee for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year and for 1,250 hours over the previous 12 months, work at a site with at least 50 employees within 75 miles, and have leave time available.

**Reasons for taking leave:**
FMLA requires covered employers to provide up to 12 work weeks of unpaid, job-protected leave during a single, 12-month period rolling backward:

- To care for the employee's child after birth, or placement for adoption or foster care;
- To care for the employee's spouse, son, daughter, or parent who has a serious health condition;
- To address certain qualifying exigencies arising from employee's spouse, son, daughter, or parent on active duty or call to active duty in the National Guard or Reserves in support of a contingency operation;
- For incapacity due to pregnancy, prenatal medical care, or post-partum recovery;
- For a serious health condition that makes the employee unable to perform their job.

Qualifying exigencies may include attending certain military events, arranging for alternative child-care or parental care, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post deployment reintegration briefings.

**Use of Leave**
The employee does not need to use this leave entitlement in one block. When medically necessary, leave may be taken on an intermittent or reduced-schedule basis. Employees must make reasonable efforts to schedule leave for planned medical treatment so as to not unduly disrupt the employer's operations.

**Definition of a Serious Health Condition**
A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the employee from performing the functions of the employee's job, or prevents the qualified family member from participating in daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Benefits and Protections**
While on FMLA leave, the employer must maintain the employee's health coverage under any "group health plan" on the same terms as if the employee had continued to work.

Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.

Use of FMLA cannot result in the loss of any employment benefit that accrued prior to the start of the employee's leave.

**Substitution of paid leave for unpaid leave**
Employees may choose or employers may require use of accrued paid leave while taking FMLA leave. In order to use paid leave for FMLA leave, employees must comply with the employer's normal paid leave policies.

**Employee Responsibilities**
Employee must provide 30-days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the employee must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedure. Employees must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of leave. Sufficient information may include that the employee is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health-care provider, or the circumstances supporting the need for military family leave.
Employees must also inform their employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees may also be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**
Covered employers must inform employees requesting leave whether they are eligible under FMLA. If the employee is eligible, the notice must specify any additional information required along with a copy of this notice. If the employee is not eligible, the employer must provide a reason for the ineligibility.
Covered employers must inform employees if leave will be designated as FMLA-protected and the amount of leave counted against the employee's leave entitlement. If the employer determines that the leave is not FMLA-protected, the employer must notify the employee.

**Unlawful Acts by Employers**
FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA;
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or related to FMLA.

**Enforcement**
The employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer. FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

**For Additional Information**
Please contact the nearest office of the Wage and Hour Division, listed in most telephone directories under US Government – Department of Labor, or contact your human resource department.

From=[redacted]
Sent=Tue Oct 10 19:11:19 CDT 2023
To=[redacted]
Subject=Intake Transmission for Samantha Elizabeth Parreno
Enclosed is the Intake information for Samantha Elizabeth Parreno
[Employee Number: MW7000334 ] at David Sutherland, LLC

Employee's Work State / Province: Illinois
DISCLAIMER: The information contained in this e-mail may be confidential and is intended solely for the use of the named addressee. Access, copying or re-use of the e-mail or any information contained herein by any other person is not authorized. If you are not the intended recipient please notify us immediately by returning the e-mail to the originator.

M

# FMLASource Disability Intake Transmission

## Intake Snapshot

| | |
|---|---|
| Intake Date and time: | 10/10/2023 4:37:34PM |
| FMLASource Intake Representative: | [redacted] |
| Adjusted Intake? | Yes |
| Claim Initiated by | Employee |
| Requested by Name | |
| Summary Status | Partially Approved |

## Eligibility File Feed

## Employee Demographic and Contact Information

| | |
|---|---|
| Employee Full Name: | Samantha Elizabeth E Parreno |
| SSN: | [redacted] |
| Date of Birth: | [redacted] |
| Gender: | [redacted] |
| Postal Address: | [redacted] |
| Home Phone: | |
| Mobile Phone: | [redacted] |
| Work Phone: | |
| Personal Email: | [redacted] |
| Work Email: | |
| Alternate Email: | |
| Other Email: | |

## Employee Position Information

| | |
|---|---|
| Job Title: | OSMW - Outside Sales - Midwest |
| Date of Hire: | 05/13/2019 |
| Employee ID | MW7000334 |
| Adjusted Hire Date: | |
| Date of Termination: | |
| Employee Group 2: | |
| Full/Part Time: | Full-time |
| Employee Group 3: | Salary |
| Hours Worked/Week: | 40.00 |
| Employee Group 4: | |
| Employee Group 5: | |
| Employee Group 1: | EXEMPT |
| Employee Group 6: | |

## Work Location Information

| | |
|---|---|
| Account Name: | David Sutherland, LLC |
| Work Location: | CHSHW Chicago Showroom -- 222 Merchandise Mart -- Chicago -- Illin |
| Work State: | Illinois |
| Business Unit: | 313110 - Chicago Showroom |
| Organization: | CHSHW - Chicago Showroom |
| Vendor Identifier: | G000BQRB |

## Contact Information

| | |
|---|---|
| Employer Contact: | |
| Employer Contact Job Title: | |
| Employer Contact Phone: | |
| Employer Contact Work Email: | |
| Employer Contact Type: | |

## Disability Eligibility Information

| | |
|---|---|
| Leave Reason | Employee's Serious Health Condition |
| Weekly STD Earnings: | [redacted] |
| STD Eligibility: | 05/13/2019 |
| LTD Eligibility: | |
| Estimated Begin Date: | 08/16/2023 |
| Estimated End Date: | 09/04/2023 |
| Employee Reported Workers Comp: | No |
| HR Verified Workers Comp: | No |
| Last Date Worked: | 08/15/2023 |
| Condition & Details | Other, SHC |

## Health Care Provider Information

| | |
|---|---|
| Health Care Facility Name: | |

| | |
|---|---|
| Health Care Provider's First Name: | [redacted] |
| Health Care Provider's Last Name: | [redacted] |
| Specialty: | |
| Credential: | [redacted] |
| HCP Phone: | [redacted] |
| HCP Fax: | [redacted] |

**Partner Intake Questions**

| | |
|---|---|
| If surgery, please provide date of surgery? | |
| Is this a recurrent condition? If yes, when did it begin? | no |
| Hours worked on last day | 8 |
| Date first unable to work: | 08/15/2023 |
| Date of first appointment for this disability: | 8/16/2023 |
| Date of next appointment related to disability | 8/16/2023 |
| What is your actual or estimated disability end date? | 09/18/2023 |
| Estimated return to work date: | 09/19/2023 |
| Is your condition the result of an accident or illness? Details? - if claim is for Maternity, please indicate N/A | n/a |
| Is the condition the result of a motor vehicle accident? If yes, is there an accident report? - if claim is for Maternity, please indicate N/A | no |
| Has a workers comp claim been filed or in the process of being filed? Have you received workers comp benefits? Are you appealing a workers comp decision? (Please include any and all details.) - if claim is for Maternity, please indicate N/A | no |
| Will you be hospitalized due to this condition? | No |
| If yes, what were the hospitalization dates? | |
| If leave is for maternity, date of last menstrual period? | |
| Pre-natal or post-partum complications | |
| Please provide any additional comments: | Healthcare provider certified dates 08/16/2023 to 09/19/2023 |

Please be advised that these questions may be used to initiate additional claims on your behalf. You may be contacted by a representative of Mutual of Omaha in the near future. The representative will verify the information that has been gathered by AbsencePro in your submission for your leave request, as well as gather additional information needed to review your claim for paid benefits. It would be of great benefit to supply the representative with as much information as possible regarding your leave. Please be aware that a leave request or completed application for additional coverages does not guarantee benefits. Eligibility and certain policy provisions may exclude you from benefits.